**ISC HOLDING AG, Petitioner,**

v.

**NOBEL BIOCARE INVESTMENTS, N.V., Respondent.**

**No. 08 Civ. 11051(LLS).**

United States District Court,
S.D. New York.

Nov. 22, 2010.

---

Pamela Rogers Chepiga, Louis B. Kimmelman, Allen & Overy, Ira Brad Matetsky, Matthew Norman Tobias, Ganfer & Shore, LLP, New York, NY, for Petitioner.

Adam Craig Silverstein, Martin S. Hyman, Golenbock Eiseman Assor Bell &

Peskoe LLP, New York, NY, for Respondent.

## MEMORANDUM and ORDER

LOUIS L. STANTON, District Judge.

At a routine pre-motion conference on September 21, 2010 petitioner's former counsel, Ira Matetsky, Esq., briefly and privately[1] stated his reasons for applying to withdraw as counsel. He complained that [Redacted][2] (Respondent had previously questioned the genuineness of the document and asserted it might be fabricated.) Mr. Matetsky concluded, [Redacted].

When I informed the parties that I was relieving Mr. Matetsky as of September 30, after he completed and served petitioner's draft pre-trial order, respondent's counsel stated that depositions they had taken "verified false representations to the court." I directed that incoming counsel for petitioner file a notice of appearance by October 15.

Petitioner now moves for my recusal, arguing that information prejudicial to their client was conveyed to me privately, and would cause a reasonable person to question my impartiality.

1.

■ The Supreme Court has stated in *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994):

1. No court reporter was present, as the parties had declined the use of one. There was no objection to my hearing Mr. Matetsky's concerns *in camera*. My law clerk took notes, which have been furnished with a typed transcript, to petitioner's present counsel. At my direction, Mr. Matetsky has also furnished petitioner's present counsel with his recollection of what transpired.

2. In this opinion, I restrict my disclosure of Mr. Matetsky's remarks to the highest level of generality, without factual disclosure, and to the minimum required to explain the decision. Whether or not the matter had been privileged, such necessities are inherent in the nature of the motion. Nevertheless, as an accommodation to plaintiff's sensibilities and to avoid embarrassment from wider dissemination concerning an unadjudicated point, I am allowing these redactions from the publicly available opinion.

... opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

In this case, not even an "opinion" could be formed on the basis of the *in camera* communication. At most, it could give rise to the suspicion or inference drawn by Mr. Matetsky.

Taken alone, Mr. Matetsky's conclusion [Redacted] But it must be taken in context. It does not relate to whether there was agreement on an arbitration clause, which is the issue in the case, but to a question of credibility about a collateral scheduling dispute. By its own terms, it is speculative, recognizing that the problem might reflect only a lack of needed cooperation. It was old and familiar stuff: since May I had been addressed by respondents with threats of applications for sanctions for petitioner's alleged lack of cooperation in discovery, and evasive and inconsistent statements. Most significantly, any adverse inference drawn from Mr. Matetsky's speculation was immaterial in comparison to respondent's description of the evidence it expected to offer at trial, (Respondent's Pretrial Order ¶¶ 36–42 [second], pp. 15–18, Ex. 7 to Hyman Declaration, submitted to Court on October 20):

Michaelson and Tchividjian have repeatedly lied to the Court and manufactured evidence, largely in an effort to delay and frustrate NBI's taking of discovery. (*See* ¶¶ 36–42 infra.) On May 4, 2010, two weeks before the long scheduled depositions of all witnesses in the case were to be taken in London, ISC informed its counsel that "Asher Tchividjian has had an unexpected and unavoidable business obligation arise which conflicts with the current scheduling of the depositions" and that Tchividjian therefore would be "unavailable the entire week of May 17th"; ISC instructed its counsel to "request a short adjournment of the depositions for a few weeks." (E-mail from Tobias to Silverstein, dated May 4, 2010.) In a letter to the Court dated May 6, 2010, ISC's counsel thus explained that "Asher Tchividjian, one of the principals of ISC has had an unexpected and unavoidable business obligation arise, requiring him to be in Madrid for the week of May 17, 2010" and, on that basis, sought to postpone all of the previously scheduled depositions in the case. (Letter from Tobias to Court, dated May 6, 2010.)

37. After a conference to discuss these issues, the Court offered Tchividjian the choice between appearing in London for his deposition during the week of May 17, 2010, as scheduled, or traveling to New York at his or ISC's expense at a later time to appear for his deposition. Tchividjian opted to appear for his deposition at a later time in New York (subsequently scheduled for June 23, 2010). (E-mail from Matetsky to Silverstein, dated May 11, 2010; Tchividjian Ex. 2.) In fact, Tchividjian has since admitted under oath that he was not "unavailable the entire week of" May 17th; he was in Madrid for less than 3 days. (Tchividjian Tr. at 23/9–25/2, 30/15–31/16; Tchividjian 9/30/10 Decl. ¶¶ 7, 10–12.) Nor did he expect to be in Madrid that entire week. To the contrary, he had made arrangements to fly a commercial airliner back to his residence in Dubai from Paris before week's end (on Wednesday or Thursday of that week). (*Id.*)

38. On June 21, 2010, two days before Tchividjian's rescheduled deposition in New York, ISC sought to postpone Tchividjian's deposition a second time.

That day, Michaelson reported to ISC's counsel by telephone and e-mail that "coming through an airport on his travels on Friday [June 18, 2010], Asher's passport was accidentally torn by an immigration official" and "[a]s such the tears through the relevant numbers on the passport mean that he thinks it is highly unlikely that U.S. immigration will accept it." (Tchividjian Ex. 6.) Michaelson explained that Tchividjian "applied for a new one immediately" and that he would "make himself available at any time as soon as the new passport is ready." (*Id.*) In a letter to the Court two days later, ISC's counsel, based on information supplied by ISC, further elaborated that "the damage to Mr. Tchividjian's passport ... occurred at the hands of an immigration officer in Dubai, where Mr. Tchividjian was arriving from Bahrain." (Tchividjian Ex. 8.)

39. After NBI sought the Court's intervention regarding the postponement, on June 23, 2010, the Court directed that the parties promptly schedule Tchividjian's deposition and invited NBI to use the deposition to interrogate Tchividjian regarding the passport incident. The Court further directed ISC to produce all documents demonstrating Tchividjian's arrangements to travel to New York prior to the alleged [June 18, 2010] passport incident and the alteration of such arrangements due to the supposed tearing of the passport.

40. In response to the Court's directive, on July 7, 2010, ISC produced two documents purporting to show Tchividjian's prior arrangements to travel to New York and the subsequent alteration of such arrangements: (i) an e-mail from to [*sic*] Michaelson, dated June 16, 2010 re: "E-ticket Confirmation 12314919454," purported to show that Michael son had "successfully set up" for Tchividjian a round trip flight on

Emirates (airline reference "X3FVG8") from Dubai to JFK, departing Dubai on June 21, 2010 and returning to Dubai on June 23, 2010; and (ii) an e-mail from to [*sic*] Michaelson, dated June 22, 2010 re: "Itinerary 12314919454," stating that "[y]our request for a refund has been assessed and the airline will make a refund back to the original credit card." (Tchividjian Exs. 3 & 10.)

41. In fact, Michaelson fabricated both of these documents, by doctoring a legitimate e-mail he received from on [*sic*] June 22, 2010 re: "E-ticket Confirmation 12314919454," confirming that Michaelson had "successfully set up" for Tchividjian a round trip flight on Air France (airline reference "X3FVG8") from Paris to Barcelona, departing Paris on June 26, 2010 and returning to Paris on June 27, 2010 (EXP005–07; Trial testimony of Adam Michaelson.) Michaelson never purchased an airline ticket for Tchividjian to travel to New York prior to Tchividjian's scheduled June 23, 2010 deposition. (EXP001–07; Deposition testimony of Expedia, Inc.; Trial testimony of Adam Michaelson.) Rather, in response to a Court directive, Michaelson fabricated evidence to suggest that he had purchased such tickets, subsequently cancelled them and sought a refund. (*Id.*)

42. Furthermore, the passport incident itself appears to have been fabricated. When asked at his deposition on July 13, 2010 about the incident, Tchividjian provided an account that was materially different from the version that had been conveyed to ISC's counsel and, thereafter by ISC's counsel, to NBI's counsel and the Court. Tchividjian testified that his passport was really "messed ... up" on June 5 or 6, 2010 by East African officials, who tore the passport while jerking it from a scanner, and

that he immediately applied for a new passport at that time. (Tchividjian Tr. at 78/18–88/12). Contrary to what had been communicated to counsel and the Court, Tchividjian testified that Dubai immigration officials never mishandled his passport at all; in fact, Tchividjian does not even use his passport when he enters or exits Dubai. (Tchividjian Tr. at 31/21–33/5.) Rather, according to Tchividjian's deposition testimony, it was Bahraini officials who completely severed the ID page from the remainder of his passport when he was exiting that country en route to Dubai on Thursday, June 17, 2010. (Tchividjian Tr. at 98/16–106/8.) The many inconsistencies between Tchividjian's account and the account provided to the Court and counsel, coupled with the absence of any evidence that Tchividjian ever planned to travel to New York, leads to the conclusion that the alleged passport incident was the product of yet another of [sic] series of ISC's lies and deceptions.

42. At a conference with the Court on August 10, 2010, during which NBI's counsel raised the inconsistencies between Tchividjian's deposition testimony and the prior representations to the Court concerning his travel arrangements, the Court directed that Tchividjian prepare a sworn Declaration detailing his travel arrangements relating to his two previously postponed depositions and provide such Declaration to NBI's counsel within two weeks after receiving a list of pointed questions from NBI's counsel. NBI's counsel delivered its questions to ISC's counsel on August 13, 2010. (Tchividjian 9/30/10 Declaration.) By directive of the Court, therefore, Tchividjian's declaration was due in the hands of NBI's counsel on or before August 27, 2010. Without any excuse for his untimeliness, Tchividjian did not execute the Declaration and pro-

vide it to NBI's counsel until over one month later, on September 30, 2010, on the day it knew its prior counsel would be withdrawing from the case. (Id.) His declaration is devoid of critical detail, intentionally omits, based on his unsubstantiated invocation of Swiss Bank "secrecy" laws, material information that the Court directed him to provide and is evasive. (Id.)

\* \* \*

No judge could make findings or form an opinion with respect to the body of those assertions without seeing and hearing the evidence on both sides. That is the purpose of the hearing.

What is clear is that if after seeing and hearing all the evidence the Court rejected the claims made above, [Redacted] would have no effect the other way. If, on the other hand, the evidence tendered above proved persuasive, [Redacted] could add nothing. Either way, they are immaterial. What controls is the evidence, not the earlier impressions of counsel on either side.

No reasonable person, knowing and understanding all the relevant facts, would conclude that my impartiality might reasonably be questioned.

2.

█ Petitioner submits that it was improper to hear Mr. Matetsky in camera. On the contrary, it is normal practice and there is no impropriety. See, e.g., Weinberger v. Provident Life and Casualty Insurance Company, No. 97 Civ. 9262(JGK), 1998 WL 898309, at \*1 (S.D.N.Y. Dec. 23, 1998):

In the course of its objection, the defendant argues that the Magistrate Judge should not have considered a November 10, 1998 letter from the plaintiff's former counsel to the plaintiff and a November 19, 1998 affidavit from the plain-

tiff's counsel setting forth the reasons for the motion to withdraw. Both of those documents will be filed in the record under seal. However, it is appropriate for a Court considering a counsel's motion to withdraw to consider in camera submissions in order to prevent a party from being prejudiced by the application of counsel to withdraw. *See, e.g., Rophaiel v. Alken Murray Corp.,* 94 Civ 9064, 1997 WL 3274, at *1 (S.D.N.Y. Jan. 3, 1997) (indicating that in camera consideration of papers supporting motion to withdraw as counsel is proper by directing "counsel for defendants ... to file submissions with the Court for review in camera"); *Harrison Conference Servs., Inc. v. Dolce Conference Servs., Inc.,* 806 F.Supp. 23, 25–26 (E.D.N.Y. 1992) (holding that withdrawing counsel's in camera submission of papers supporting motion to withdraw as counsel was proper); *Ficom Int'l, Inc. v. Israeli Export Inst.,* 87 Civ. 7461, 1989 WL 13741, at *3 n. 1 (S.D.N.Y. Feb. 10, 1989) (noting that disclosure to opposing counsel of reasons for seeking to withdraw as counsel could "pos[e] ethical problems" and thus indicating that "the proper practice for an attorney in applying for an order relieving him of responsibility in a case is ... to submit supporting documents to the trial court for inspection in camera").

In the *Weinberger* case, and in *Patterson v. CBS Inc.,* 94 Civ. 2562, 1996 WL 724697 (S.D.N.Y. Dec. 16, 1996) both relied on by petitioner, magistrate judges rather than district judges reviewed the applications for withdrawal, but in both cases the dockets reveal that the district judges had already assigned all pre-trial proceedings to the magistrate judges.

3.

The detail and scope of the history recited in the long quotation (pp. 291–93 above)

from the pre-trial order is only ancillary to the portions concerning the main issue in the case, which is the formation and inclusion of the arbitration clause. Nevertheless, it gives a taste of the inappropriateness of reassigning this case to another judge at this point, after two years of litigation procedures, a decision on the merits, appeal and remand, and only days from a final hearing.

Conclusion

The motion for recusal is denied. Petitioner's counsel are directed to file, under seal, copies of (1) my law clerk Gregory Apgar's handwritten notes of the entire September 21, 2010 conference, with (2) their typed transcript and (3) Ira Matetsky, Esq.'s declaration regarding the conference, in an envelope whose cover shall identify, but not disclose, its contents for the docket.

So ordered.